AFFIDAVIT OF SPECIAL AGENT MATTHEW R. ZAREMBA
IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS FOR
15 FRANK STREET, APARTMENT 3, DRACUT, MA, A BLACK 2016 ACURA RDX, AND
<u>THE PERSON OF SAMBO BUTH</u>

I, Special Agent Matthew R. Zaremba, being duly sworn, depose and state that:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.      I am a federal law enforcement officer within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.

2.      I have been a Special Agent with the FBI since 2006.  I am currently assigned to

the Boston Field Office, Lowell Resident Agency.  I am assigned to work Counterterrorism and

Criminal matters to include investigations focused on transnational organized crime, threats to

life, violent gangs, drug trafficking, and violent crimes against children.  Prior to my current

assignment I was assigned to FBI Headquarters' where I worked joint overseas investigations

related to threats against the United States to include kidnappings, murders, terrorist plots and

attacks.  I have also worked on a Combined Joint Interagency Task Force, served as an Assistant

Legal Attaché in South Africa, and worked on the FBI's Joint Terrorism Task Force in Boston,

MA.

3.      As an FBI Special Agent, I am authorized to investigate violations of the laws of

the United States, including violations of federal narcotics laws in Title 21 of the United States

Code.  During my law enforcement career, I have received specialized training regarding the

activities of narcotics traffickers, including the methods used to package, store, and distribute

narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of

their narcotics trafficking activities.

4.      I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, fentanyl, oxycodone, methamphetamine, and other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the street terms used in their trade.

5.      I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits for federal court– in support of applications for criminal complaints, search warrants, and tracking warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.

6.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."  I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled conversations, text messages, pager messages, and other means to facilitate

2

their illegal activities. I am familiar with the manner in which narcotics traffickers use telephone, coded, or slang-filled conversations when discussing their illegal business, in an effort to further prevent detection.  I am familiar with the street terms used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## II.   PURPOSE OF THE AFFIDAVIT

6.     I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

7.     Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the applications for the requested search warrants, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants. All times herein are approximate.

8.     Based on the investigation, there is probable cause to believe that, between or about May 2, 2019 and August 21, 2019 in Lowell and Burlington, Massachusetts, SAMBO BUTH a/k/a "Chewy," a/k/a "Chew," a/k/a "Ching," possessed with intent to distribute and distributed cocaine, heroin and fentanyl, in violation of 21 U.S.C. § 841(a)(1); conspired to do the same, in violation of 21 U.S.C. § 846; and engaged in the business of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A) (the "Target Offenses").

9.     This affidavit is being submitted in support of applications for a warrant to search the residence of  BUTH at 15 Frank Street, Apartment 3, Dracut, Massachusetts (the "**Target**

Premises 1"), as described in Attachment A-1; a black 2016 Acura RDX, bearing Massachusetts registration 8NB586, vehicle identification number (VIN) 5J8TB4H54GL008661, registered to Sambo Vanny BUTH, 35 Dana Street, Lowell, MA 01850 ("**Target Premises 2"**); and the person of BUTH, as described in Attachment A-3 (collectively, the "Target Premises"), because there is probable cause to believe that each of these Target Premises contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

10.     This affidavit describes a series of controlled purchases from BUTH under the direction of the FBI by an FBI cooperating witness (hereinafter, CW-3)[1].  For each of these controlled purchases, agents first searched CW-3 for contraband such as illegal drugs, weapons, or money; provided CW-3 with an audio transmitter/recorder and an audio/video recorder and, when able, placed an audio/video recorder in CW-3's vehicle; and gave an amount of money in Official Agency Funds ("OAF") with which to make the purchase.  Agents then established surveillance in the location of the controlled purchase during the period leading up to and throughout the transaction.  Following the controlled purchase, agents followed CW-3 to a predetermined meeting location, where agents again searched CW-3, turned off the recording devices, and retrieved the recording and transmitting devices and any contraband.

**III.     PROBABLE CAUSE THAT FEDERAL CRIMES WERE COMMITTED**

11.     On May 2, 2019, CW-3 provided the following information to the FBI: that

---

[1] Between May 2019 and August 2019, CW-3 made six consensually monitored controlled purchases of illegal narcotics, including cocaine, fentanyl and heroin, and one of those consensually monitored purchases was a combined illegal narcotics and a firearm from BUTH.  CW-3 is facing state charges and is cooperating in the anticipation of a recommendation for more lenient treatment.  CW-3 has also been paid by the FBI for providing assistance.  CW-3 has criminal convictions including illegal firearms possession, home invasions, and witness intimidation.  CW-3 has provided information and assistance which has led to search and arrest warrants and I am not aware of CW-3 providing information that was found to be unreliable.  I believe that the information provided by CW-3 in this investigation is accurate because of CW-3's record for reliability and because of the use of consensual recordings for corroboration.

BUTH still did not have any product, which I understood to mean illegal narcotics; that he (BUTH) was waiting for a shipment via either FedEx or UPS; that the shipment should be there by the end of the weekend [i.e., May 5, 2019]; and that BUTH would call CW-3 when the product had arrived.

12.     On May 7, 2019, CW-3 informed the FBI that BUTH had contacted CW-3 the night prior and informed CW-3 that BUTH's shipment had arrived.  CW-3 told BUTH that CW-3 would purchase 62 grams from BUTH and would set something up for Thursday [May 9, 2019] evening after work.

### *May 9, 2019, Controlled Purchase of 60.9 Grams of Cocaine*

13.     On May 9, 2019, under the direction of the FBI, CW-3 conducted a controlled purchase of 62 grams of cocaine from BUTH, in Lowell, Massachusetts, for $2800.   At 3:58pm[2], CW-3 informed agents that BUTH had directed CW-3 to BUTH's brother's house to conduct the deal.  I am aware that BUTH's brother is Phearum MEAS a/k/a BONES, whose address is 35 Dana Street, Lowell, MA.[3]

14.     At 6:40pm, CW-3 met with agents at the pre-determined location.  CW-3 confirmed that BUTH directed CW-3 to BUTH's brother's house at 35 Dana Street, Lowell and that CW-3 had previously placed the order for 62 grams of cocaine with BUTH and confirmed that the price was $2,800.  After following the procedures described above with negative results, agents provided CW-3 with $2,800 in OAF and set up surveillance in and around Lowell leading up to and during the duration of the controlled purchase.

---

[2] All times are approximate.
[3] BUTH also has 35 Dana Street as his address on his MA RMV drivers license and **Target Premises 2** is registered to 35 Dana Street. However as described below, and based on BUTH describing 35 Dana Street to CW-3 as his brother's house, I believe that BUTH's actual residence is 15 Frank Street, Apt 3, Dracut, MA, **Target Premises 1.**

15.     At 7:24pm, surveillance observed CW-3 arrive at 35 Dana Street and enter the garage with BUTH.  At 7:32pm, surveillance observed CW-3 depart 35 Dana Street.

16.     Surveillance followed CW-3 back to the predetermined meeting location, where agents turned off and retrieved the recorders, searched CW-3 with negative results, and recovered a plastic bag containing a hard-white substance and a powdery substance.[4]  CW-3 provided the following information: CW-3 only entered the garage next to 35 Dana Street; BUTH said that he had run out of cocaine already and had set the 62 grams aside for CW-3; and BUTH showed CW-3 red pills that CW-3 believed to be MDMA.

17.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on May 9, 2019, and identified BUTH, with whom they were familiar, as the person who sold CW-3 the cocaine.   Agents familiar with BUTH's voice also recognized his voice on the recording conversing with CW-3 consistent with drug trafficking.  In particular, BUTH said "I let the dude [his supplier] know 'yo I can't fuck with you when you have the fentanyl in that'. So he needs to know what's good in stuff."[5]

### May 28, 2019, Controlled Purchase of 61.2 Grams of Cocaine and 25 Percocets

18.     On May 28, 2019, under the direction of the FBI, CW-3 made a controlled purchase of 61.2 grams of cocaine and 25 Percocet pills[6] from BUTH, in Burlington, MA, for $3250.

19.     At 6:00pm, CW-3 arrived at the predetermined meeting location and advised that BUTH would be meeting CW-3 near the mall and that CW-3 would confirm the exact time and location when provided that information by BUTH. CW-3 had previously placed the order for 62

---

[4] The DEA Northeast Lab confirmed that the bag contained 60.9 grams of Cocaine.
[5] All quotations are based on preliminary review of the recordings.
[6] In a text message exchange between BUTH and CW-3 between May 24 and 28 2019, CW-3 requested 25 pills. BUTH responded "U want the fake stuff? The blues," to which CW-3 confirmed and arranged to meet BUTH on May 28, 2019.

grams of cocaine and 25 Percocet pills with BUTH and confirmed that the price was $3250.00. Agents followed the procedures described above, established surveillance in the vicinity of the Burlington Mall, and provided CW-3 with $3250 in OAF, and directed CW-3 to make the controlled purchase.

20.     Agents followed CW-3 to the Burlington Mall.  At 6:32pm, surveillance observed BUTH's vehicle, a 2016 Black Acura RDX, Massachusetts Registration 8NB586 (the "black RDX"), **Target Premises 2**, at the Burlington Mall parking lot, parked near the food court and sign 56.  CW-3 exited the CW-3's vehicle and entered BUTH's vehicle, **Target Premises 2** and, at 6:39pm, they departed the mall parking lot.  Surveillance identified the driver as BUTH.  At 6:41pm, CW-3 returned to CW-3's vehicle and BUTH departed the Mall.

21.     Surveillance followed CW-3 back to the predetermined meeting location, where agents turned off and retrieved the recording devices, searched CW-3 and CW-3's vehicle with negative results, and recovered a plastic bag containing a hard-white substance and a separate plastic bag containing approximately 25 light blue pills.[7]  CW-3 then provided the following information:

> BUTH brought his girlfriend and child, who was approximately two years old, with him in the car.  The girlfriend was in the front passenger seat and the child was in a car seat in the back.  CW-3 entered BUTH's vehicle and sat in the back seat next to the child.  BUTH's girlfriend[8] counted the money that CW-3 gave to BUTH. BUTH reached into the glove box and handed the drugs to the CW-3 in a green potato chip bag.  CW-3 threw away the potato chip bag.  The current pills that BUTH sold to the CW-3 were from Lawrence. BUTH would be getting new pills from California and they would be more expensive.

22.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on May 28, 2019, and identified BUTH as the person who sold CW-3 the drugs and SOKMALE CHHOY

---

[7] The DEA Northeast Lab confirmed that the hard-white substance was 59 grams of Cocaine; the pills were 3 grams of a mixture and substance containing Fentanyl and heroin.

[8] I know that BUTH's girlfriend is Sokamale Chhoy a/k/a  Molly Buth

a/k/a Molly BUTH in the vehicle.  Agents familiar with BUTH's voice also recognized BUTH's voice on the recording having a conversation with CW-3 consistent with drug trafficking.  In particular, BUTH said "Yeah so my boy has been getting them- I gave them to a couple of my people they like it better than this one."  Later, CHHOY said "Twenty-nine, Thirty…" as she was counting the money.

### June 12, 2019, Controlled Purchase of 100 Percocets

23.     On June 12, 2019, under the direction of the FBI, CW-3 made a controlled purchase of 100 Percocet pills[9] from BUTH in Burlington for $1800.

24.     Starting at 4:58pm, surveillance observed BUTH at 25 Dana St, Lowell, MA.  At 5:15pm, an unidentified male exited the detached garage at 35 Dana St and entered the residence.  At 5:19pm, BUTH departed 35 Dana St in the black RDX, **Target Premises 2**.  I believe 35 Dana Street to be BUTH's brother's residence.  At 5:20pm, BUTH arrived at an apartment complex between 367 & 363 Hildreth St, Lowell, MA, where a female passenger (believed to be CHHOY) got into the black RDX, and then BUTH departed. At 5:38pm, surveillance lost sight of the black RDX at the intersection of Chelmsford St and Route 3 as the black RDX passed under the overpass of Rt 3.

25.     At 6:10pm, CW-3 arrived at the predetermined meeting location and advised that BUTH would be meeting the CW-3 near the mall.   After following the above procedures with negative results, agents provided CW-3 with $1,800 in OAF, directed CW-3 to make a controlled

---

[9] In a series of text messages between BUTH and CW-3 between June 10 and 12, 2019, CW-3 ordered 100 of the blues and coordinated the date and time of the controlled purchase.  In that conversation, BUTH asked "Only the 100 fakes right?", to which CW-3 concurred.  Later, CW-3 asked for a better price.  BUTH said "This guy only drop it 500 plus. but I can do u 50 cent cheaper."  CW-3 said ok.  BUTH said "I grabbed 150 yesterday. Ur 100. N my 50 . N word I asked any deals? He's like nah man".

purchase and set up surveillance in the area of the Burlington Mall.  At 6:20pm, agents followed CW-3 to the Burlington Mall parking lot.

26.     Staring at 6:44pm, surveillance observed the following: CW-3 met BUTH outside of the CW-3 vehicle in the parking lot and then both the CW-3 and BUTH returned to the CW-3 vehicle.  At 6:50pm BUTH exited the CW-3 vehicle and walked inside the mall. Immediately following, CW-3 departed the Burlington Mall Parking lot and returned to the predetermined meeting location.

27.     Surveillance followed CW-3 back to the predetermined meeting location, where agents turned off and retrieved the recording devices, searched CW-3 and CW-3's car with negative results and recovered a cardboard ice cream box containing a plastic bag with approximately 100 light blue pills.[10]

28.     Starting at 7:12pm, surveillance saw BUTH, CHHOY and a female child approaching the black RDX, which all three entered and at 7:13pm, the black RDX departed the mall parking lot.  At 7:20pm, surveillance discontinued when the black RDX arrived at H-Mart, 3 Old Concord Rd, Burlington, MA.

29.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on June 12, 2019, and identified BUTH, with whom they were familiar, as the person who sold CW-3 the pills.  Agents familiar with BUTH's voice also recognized BUTH's voice on the recording having a conversation with CW-3 consistent with drug and firearms trafficking.  In particular, CW-3 asked BUTH for a "burner," which I understand to mean gun, and BUTH said that they are getting some from down south, specifically "ATL" [Atlanta, Georgia], that since two of his boys got smoked, they were going to bring up some more, and that they used get 20 plus at a time.  BUTH also said

---

[10] The contents of the box were submitted to the DEA Northeast Laboratory, from whom results are still pending.

that he has two already so he didn't need to buy one right now but has a boy who was coming up from North Carolina with three guns.

### July 18, 2019 Controlled Purchase of 100 Percocets

30.     On July 18, 2019, under the direction of the FBI, CW-3, made a controlled purchase of 100 Percocet pills from BUTH, in Burlington for $1800.

31.     At 6:00pm CW-3 arrived at a predetermined meeting location and advised that CW-3 had previously placed an order for 100 pills and that BUTH would be meeting CW-3 inside the mall.  After following the above procedures with negative results, agents provided CW-3 with $1,800 in OAF, directed CW-3 to make a controlled purchase and set up surveillance in the area of the Burlington Mall.  At 6:10pm surveillance observed BUTH's vehicle, the black RDX, **Target Premises 2** at the Burlington Mall parking lot, parked near the food court.  At 6:23pm CW-3 departed the predetermined meeting location and surveillance followed CW-3 to the Burlington Mall parking lot.  Surveillance observed CW-3 walk into Lord and Taylor at the Burlington Mall.

32.     Starting at 6:50pm surveillance observed CW-3 meeting with BUTH in the food court until 7:02pm.  Surveillance followed CW-3 back to the CW-3 vehicle and then back to the predetermined meeting location.  At 7:40pm CW-3 arrived back at the at predetermined meeting location.

33.     Surveillance followed CW-3 back to the predetermined meeting location, where agents turned off and retrieved the recording devices, searched CW-3 and CW-3's car with negative results and recovered a Colgate toothpaste plastic bag containing a small plastic bag with approximately 100 white pills.[11]

---

[11] The contents of the box were submitted to the DEA Northeast Laboratory, from whom results are still pending.

34.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on July 18, 2019, and identified BUTH, with whom they were familiar, as the person who sold CW-3 the pills.  Agents familiar with BUTH's voice also recognized BUTH's voice on the recording having a conversation with CW-3 consistent with drug (and firearm) trafficking.  In particular, CW-3 asked BUTH for a "burner," which I understand to mean gun, and BUTH said "Oh, yeah, I can probably get you one, but this kid was trying to sell it for too much."  BUTH said "He E-mailed us. He said he got a small one".  CHS acknowledged.  BUTH said "I'd rather go through my own boy".  BUTH said he may be able to get a nine, which I know means a 9mm handgun.

### Conversations Regarding Illegal Firearms Purchase

35.     On July 19, 2019, BUTH texted CW-3, "Look up for Taurus 85.[12]  See if u looking for something like that. Or something that holds more".

36.     On July 27, 2019, CW-3 replied, asking what was a Taurus 85 and how much? BUTH replied "650. It's a nice size. To u it will seem more smaller since u bigger than me. but that's good it's nice n small. It's a 9. Hold 12. 13 with 1 in the head. I can have my cousin clean it before I give to u. He has the equipment/kit".  BUTH texted "Look up g2 Millennium".  BUTH sent CW-3 a screenshot of a Taurus Millennium 2, Semi-Automatic, 9mm 3.25" Barrel, 12+1 Rounds.  BUTH texted "My co worker wants mine. But I said I got 1 of my boy who needs it more."  CW-3 said that CW-3 would buy that gun and would call BUTH in a week

37.     On July 30, 2019, CW-3 asked BUTH via text if he could see BUTH tomorrow around the same time?  BUTH replied via text "Yea I'll let u no. Im second guessing it haha. It's my baby been around . n it's hard to find something that nice n that size.  Most importantly. holds

---

[12] A Taurus Model 85 is a small-frame five shot revolver.

12-13 being that small . is which gets me"  CW-3 acknowledged. BUTH replied "I'll definitely find u something else . soon"

38.     On August 6, 2019, CW-3 asked BUTH via text message if he was able to find one. BUTH replied "I'm trying still . it will come soon".  CW-3 requested another 100.  BUTH agreed to meet on Thursday (August 8, 2019).

### *August 8, 2019 Controlled Purchase of 100 Percocets*

39.     On August 8, 2019, under the direction of the FBI, CW-3 made a controlled purchase of 100 Percocet pills from BUTH, in Burlington, for $1800.  At 6:15pm, CW-3 arrived at the predetermined meeting location and advised that BUTH would be meeting CW-3 near the mall.  CW-3 had previously placed the order for 100 Percocet pills and confirmed that the price was $1800.  At 6:25pm, BUTH informed CW-3 that BUTH was inside the mall with his family. CW-3 requested to meet BUTH out front of the mall in CW-3's vehicle. Agents followed the procedures described above, established surveillance in the vicinity of the Burlington Mall, provided CW-3 with $1800 in OAF and directed CW-3 to make the controlled purchase. Agents followed CW-3 to the Burlington Mall where they saw CW-3 pick up BUTH in CW-3's vehicle.

40.     Starting at 6:31pm, surveillance observed the following: BUTH entered CW-3's vehicle; CW-3 and BUTH drove together in CW-3's vehicle around the Burlington Mall Parking lot; at 6:37pm BUTH exited CW-3's vehicle; and CW-3 departed the Burlington Mall Parking lot and returned to the predetermined meeting location.

12

41.     Surveillance followed CW-3 back to the predetermined meeting location, where agents turned off and retrieved the recording devices, searched CW-3 and CW-3's car with negative results and recovered a plastic bag with approximately 100 white colored pills.[13]

42.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on August 8, 2019, and identified BUTH, with whom they were familiar, as the person who sold CW-3 the pills.  Agents familiar with BUTH's voice also recognized BUTH's voice on the recording having a conversation with CW-3 consistent with drug trafficking. In particular, BUTH said "Yeah yeah it's like in um um in 10 little- like I guess he[14] separated like 10, 10, 10, 10".  BUTH also said that he had not found a firearm yet, but would let CW-3 hold one of his. CW-3 explained that CW-3 wouldn't want to give BUTH back a dirty gun. BUTH said "yeah yeah yeah. Okay yeah- but I been asking around cause there was a lot of people selling them".  BUTH further explained that he had three of his own. BUTH said that "Yeah yeah- yeah cause I got (1) one that I usually leave at home"… "That one stays- that one holds like 17 so I want that at home"…" And then uh the other one I usually carry when I'm in town"…" Yeah I always carry that when I'm in town. That's the one I was gonna give you I was like aw shit this is a good size".  BUTH also explained that he left one of his firearms with a friend "Yeah, that's why I like that one too but my boy been a hold-hold that. But I'll try to find you some. There's always some going around".

### *Conversations Regarding Illegal Firearms Purchase*

43.     Starting on August 18, 2019, in a series of text messages, BUTH and CW-3 discussed the availability of a firearm for sale.  BUTH said "Dude hit me up yesterday . but I Thot it wasn't good for u. 380 palm size but only held 6. For 600. So I sed nah im looking for something

---

[13] The contents of the bag were submitted to the DEA Northeast Laboratory, from whom results are still pending.

[14] BUTH was likely describing how the pills were separated, likely by BUTH's source of supply.

that hold more. Plus 380s. Known to jam".  CW-3 replied that CW-3 would be interesting in purchasing it.  To which BUTH responded "The 380?".  CW-3 confirmed. BUTH replied "Nah. He texted me. N sed he don't send pics. So I have to look at it in person".  CW-3 asked BUTH to look at the firearm and let CW-3 know how it looked.  BUTH said "Ok. I'll let u no."  BUTH later replied "Never hit me back up.  Was gonna look for u. Some other dude just hit me up for a glock 27. Wit extended . brand new out the box. For 1000. I told him we all set looking for something in the 550-7 range".

44.    On August 20, 2019 in a series of text messages, CW-3 requested a firearm for purchase. CW-3 asked BUTH if the Glock 27 was available to purchase for $800.  BUTH replied "I no.i tried. Dudes like nah man it's brand new out of box. N come with extended. But yea my other boy never hit me back up".   Later on the same date CW-3 asked if BUTH's contact still had the firearm.  BUTH replied "Nope he got rid of it.  I'll just sell u my sr9. It's clean. Still got the case. Since I got 3. I'll always run into more. Pepo usually fast on grabbing stuff. But pepo always selling it also. Another kid had a nina for sale. But he sed it keeps jamming. I'm like I'm all set. He's like it's a easy fix. Ill fix it n give it to u. I'm like nah just let me no when u get something new".  CW-3 asked BUTH for a price for the SR9.  BUTH replied "I'll give to u for 750. It's all chrome holds 17. N still got the box I got it from."  CW-3 agreed and asked for another 100 pills. BUTH replies "Np bro. U need it right now. I got 3 already.Alright I'll try n get that 100 today". CW-3 asked to meet BUTH the following day (August 21, 2019) at 6:30pm.

45.    On August 21, 2019 in a series of text messages, BUTH agreed to sell CW-3 a Ruger SR9c firearm.  BUTH said "We still on later today?", which CW-3 affirmed. BUTH said "Alright koo. Just looked at the sr9. I haven't used it. Just recently got it couple months ago. Minor scratches. But nice n clean some extra shells. I don't no if the clip is fully loaded or not. I grabbed

14

it months ago. N will give u how I got it . the piece , clip, some shells wrapped up all inside its box. Take good care of her. She looks sweet. N also. The sr9. The clip makes it look like it's a lil extended but it's not. A natural look".

### August 21, 2019 Controlled Purchase of 100 Percocets and a Ruger SR9c firearm

46.     On August 21, 2019, under the direction of the FBI, CW-3 made a controlled purchase of 100 Percocet pills and a Ruger SR9c handgun from BUTH, in Burlington, for $3000 ($1800 for the pills and $1200[15] for the firearm).

47.     Starting at 5:55pm, surveillance observed the black RDX parked in the Burlington Mall Parking lot near pole 54.

48.     At 6:04pm, CW-3 arrived at the predetermined meeting location.  After following the above procedures with negative results, agents provided CW-3 with $3,000 in OAF, directed CW-3 to make a controlled purchase and set up surveillance in the area of the Burlington Mall.  At 6:20pm agents followed CW-3 to the Burlington Mall parking lot.

49.     Starting at 6:30pm surveillance observed the following: CW-3 exited CW's vehicle and entered BUTH's vehicle via the front passenger door; at 6:35pm, CW-3 exited BUTH's vehicle carrying a yellow plastic bag, and returned to CW-3 vehicle.  At 6:36pm, CW-3 departed the mall parking lot and returned to the predetermined meeting location.

50.     Surveillance followed CW-3 back to the predetermined meeting location where agents turned off and retrieved the recording devices, searched CW-3 and CW-3's car with negative results and recovered a yellow plastic shopping bag with "Legos" logo containing a black

---

[15] CW-3 informed Investigators of the $1200 price prior to purchase.  Upon reviewing the text message exchange on the CW-3's phone following the controlled purchase, where BUTH told the CW-3 that the price was $750, Investigators asked CW-3 to explain the discrepancy.  CW-3 relayed to investigators that during a phone call with BUTH subsequent to the text messages that he was raising the price of the firearm to $1200, which is the price CW-3 gave to investigators prior to the purchase.

gun case with a Ruger SR9c pistol, bearing serial number 332 32057, a magazine loaded with 17

rounds, and a package of ammunition;[16] and one bag with approximately 100 white colored pills.[17]

CW-3 then provided the following information to agents:

> BUTH's daughter was sleeping in the back seat. BUTH told CW-3 the gun was in the glove box. CW-3 opened the glove box and there was a yellow bag with a gun box inside of it. CW-3 opened the gun box and inspected the gun and magazine, touching both of them. CW-3 then asked BUTH about the pills. BUTH told CW-3 that they were also in glove box. CW-3 retrieved the pills from the glove box and placed them inside the gun box, inside the yellow bag. CW-3 paid BUTH $3,000 for the gun and pills.

51.     Starting at 6:53pm surveillance saw BUTH exiting his vehicle and carrying his

daughter towards the mall. BUTH and his daughter met SOKMALE CHHOY and another

unidentified male child/teenager.

52.     Agents watched the audio/video recordings of CW-3's meeting with BUTH on

August 21, 2019, and identified BUTH, with whom they were familiar, as the person who sold

CW-3 the firearm and pills.  Agents familiar with BUTH's voice also recognized BUTH's voice

on the recording having a conversation with CW-3 consistent with drug trafficking and the sale of

firearm. In particular, BUTH described the firearm as "pretty sweet" and said "It's actually very

[UI]. I haven't really touched it, I just got it a couple months ago."  BUTH told CW-3 to put the

"clip on[18]… you can see it look like an extension."  Later in the conversation, BUTH said "so that

hole is 17, so, 18 with one of the chambers."

53.     I am aware that BUTH does not possess a federal license to deal in firearms.

---

[16] In a paragraph 33 of a previous affidavit, dated May 4, 2020, submitted in support of an application for a search warrant, Case No. 20-MJ-1052-DLC, I stated that BUTH's fingerprints were identified on the gun case.  I misinterpreted the report from the FBI Lab. Upon further review, I now understand that BUTH's prints were compared to prints recovered from the gun case, but they were not identified.  The FBI Laboratory report identified another co-conspirator, not named in this Affidavit.

[17] The contents of the bag were submitted to the DEA Northeast Laboratory, from whom results are still pending.

[18] Referencing inserting the magazine into the firearm

## IV.    DRUG TRAFFICKERS' USE OF RESIDENCES GENERALLY

54.    Based on my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences.  I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of BUTH.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug-related evidence has typically been recovered including cash, records, drugs, and other valuable items.  Based on this experience and my training, I believe that:

a.    Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.  Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

b.    Drug traffickers frequently maintain books, records, receipts, notes, ledgers, money orders, emails, and other documents relating to the ordering, sale, and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances.  Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations

17

such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c.      It is common for drug dealers to conceal records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d.      It is common for drug traffickers to hide controlled substances, proceeds of drug sales (e.g., large amounts of currency, financial instruments, jewelry, safety deposit keys), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, bank

statements, checkbooks, check registers, and evidence of financial transactions relating to obtaining, transferring, hiding, or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e.      Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s).  They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f.      Drug traffickers commonly have photographs of themselves, their associates, their property, and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g.      Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h.      Drug traffickers frequently build "stash" places within their residences or

other locations in order to store illicit drugs as well as the items described above;

      i.      Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

## V.    FIREARMS TRAFFICKERS' USE OF RESIDENCES AND CELL PHONES

55.    Based upon my training and experience, as well as the training and experience of other law enforcement officers I have worked with, I know that there are common practices employed by firearms traffickers in the conduct of their illicit business.  Relatedly, I know that drug traffickers may carry weapons, including firearms, to intimidate, injurie, and threaten others or protect themselves during street transactions.  I know that individuals who own and possess firearms normally possess and maintain them for long periods of time because firearms are often expensive and do not easily wear out.  In my experience and training, firearms are unlike narcotics or currency, which are often used or exchanged soon after being obtained.  Firearms are similar to tools that a resident buys and maintains over a long period of time.  Persons who own and possess firearms generally keep them on their person, in their residence, or in their vehicles.  It has also been my experience that persons maintain firearms, along with ammunition for the firearms, in a convenient and safe location to afford ease of access and to provide security.

56.    I know that firearms traffickers often utilize tools to remove serial numbers of the firearms they traffic to avoid detection by authorities and limit law enforcement's ability to trace such firearms based on the serial number.  I also know that traffickers keep tools utilized to remove

serial numbers for future firearms to be trafficked.  I also know that traffickers also may keep records of firearms they purchased or documentation relating to the sale, i.e. receipts, gun boxes, and contact lists of people who had purchased firearms.

57.     I am aware that it is generally a common practice for illegal firearms traffickers to maintain records relating to their illegal firearms trafficking activities in their residences. Because firearms traffickers will need to have a source of supply, if they themselves are not able to lawfully purchase firearms, they tend to maintain and store records of sources of supply, amounts paid to sources of supply and other records relating to their customer base and information concerning the transactions. Such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain what is owed and to whom, in terms of money, firearms, and ammunition. Often illegal firearms traffickers keep ledgers or "pay and owe" records to show balances due for firearms sold in the past ("pay") and for payments expected ("owe") as to the illegal firearms trafficker's customers.

58.     Additionally, illegal firearms traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their illegal firearms trafficking business. Such records can be kept physically on paper, or digitally on cellular phones. I am also aware that illegal firearms traffickers often maintain such documents related to their illegal firearms trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of firearms on the premises.

59.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for illegal firearms traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from illegal firearms sales or monies to be used to purchase firearms.

60.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal firearms is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

61.     Based on training and experience, I know that most illegal firearms dealers regularly use cellular telephones to communicate about their illegal firearms trafficking activities with customers, suppliers, and other coconspirators, and to also ascertain firearms and ammunition availability and prices from websites. In my training and experience, I also am aware that illegal firearms traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, and are

central to the negotiation and coordination of firearms dealing, illegal firearms dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many illegal firearms dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by illegal firearms dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from illegal firearms dealers' residences.

## VI.    THE TARGET PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITES

61.     I believe that BUTH resides with CHHOY at the **Target Premises 1.**  According to open source research, **Target Premises 1** was last sold on May 31, 2017. It was then listed as available for rent on March 19, 2019 and then on April 12, 2019 the listing was removed. According to multiple commercially available law enforcement databases, specifically CLEAR and ACCURINT, BUTH or CHHOY or both have had a listed address for the **Target Premises 1** since April of 2019. As recently as July 2020, ACCURINT lists **Target Premises 1** as CHHOY's current residence.   As described above, BUTH and CHHOY are in a relationship and have a daughter together.

62.     On May 11, 2020, law enforcement saw the **Target Premises 2**, i.e., the black RDX, parked at 15 Frank Street, Dracut, Massachusetts, and Ravouth CHHOY, the brother of CHHOY, enter 15 Frank Street.  On May 26, 2020, surveillance observed BUTH and CHHOY exit the building of **Target Premises 1** with three minor children. BUTH and CHHOY were observed carrying trash out of the building and throwing the trash in the dumpster.  Following throwing the trash in the dumpster BUTH, CHHOY and the three minor children were observed entering **Target Premises 2** and departing the area.  Subsequently law enforcement removed and

23

searched the trash, recovering items addressed to BUTH and CHHOY at the **Target Premises 1**. Specifically, law enforcement recovered: an XFINITY bill addressed to Sambo Vanny BUTH at 15 Frank St, APT 3, Dracut, MA, i.e. **Target Premees 1**; and a court document addressed to both BUTH and CHHOY at 15 Frank St, Apt 3, Dracut, MA, i.e. **Target Premises 1**, regarding a pending class action referencing *Mark Bettencourt v. Jeanne D'Arc Credit Union*.

63.     On August 5, 2020, surveillance observed BUTH, CHHOY and three female children and one male child exit the rear door of the apartment complex containing **Target Premises 1**, enter the black RDX, **Target Premises 2**, and depart the area. On August 6, 2020, surveillance observed BUTH, CHHOY, a minor child resembling their daughter and an adult male resembling CHHOY's father sitting outside the front of the building of **Target Premises 1** and the black RDX, **Target Premises 2**  was parked in the rear parking lot**.**

64.     I believe that evidence of BUTH's criminal activity will be located inside of **Target Premises 1** and **Target Premises 2**.  Among other things, I am aware that, according to BUTH's statements to CW-3, BUTH receives shipments of drugs by FedEx and/or UPS, which BUTH may receive at his residence, the **Target Premises 1**.  In addition, on May 28, 2019, the FBI conducted a controlled purchase from BUTH by CW-3, who reported that BUTH brought his girlfriend and child in the black RDX, i.e., the **Target Premises 2**.  Because of the presence of CHHOY and, especially, the daughter, and the timeline that BUTH and/or CHHOY are believed to have **Target Premises 1** as their residence, I believe that BUTH likely went to the controlled buy from the **Target Premises 1** and returned there afterward.  Similarly, on June 12, 2019, surveillance saw BUTH depart in the **Target Premises 2** from the Burlington Mall, where the controlled purchase took place, with CHHOY and their daughter, which causes me to believe that they likely went to the **Target Premises 1**.  Again, on August 21, 2019, according to CW-3, the daughter was asleep

in the back of the **Target Premises 2** during the controlled purchase; similarly, surveillance saw BUTH with his daughter and CHHOY in the mail after the transaction took place.  As a result, I believe that BUTH likely returned to **Target Premises 1** after the controlled buy.

65.     Further, as described above, on numerous occasions, surveillance saw BUTH arrive to the controlled transactions in the **Target Premises 2**.  As a result, the **Target Premises 2** contained contraband on at least those occasions.  Furthermore, I believe that, as the location and facilitator of prior drug transactions, **Target Premises 2** itself constitutes evidence and is an instrumentality of the Target Offenses.  In addition, I believe that **Target Premises 2** likely contains evidence of the Target Offenses, such as drug records or packaging.

66.     I am aware that BUTH used at least four cellular telephone numbers to communicate with CW-3 in furtherance of the Target Offenses.  Specifically, from at least April 26, 2019 to approximately April 30, 2019, BUTH used 978-758-7413; from April 30, 2019 to approximately July 11, 2019 , BUTH used 978866-7487; from approximately July 13 2019 to at least August 21, 2019 BUTH used 978-697-6997; and on September 27, 2019 CW-3 reported to investigators that BUTH provided CW-3 with a new phone number, 978-735-3248.  I also believe that these telephones may be in **Target Premises 1**.  Based on my experience, I know that cellphones are ubiquitous and commonly in the physical possession or control of a cellphone's owner.  I also know that most drug traffickers regularly use cellular telephones to communicate about their drug-trafficking activities with customers, suppliers, and other coconspirators, and to also ascertain drug availability and pricing.  Even if  BUTH has other cellphones, however, I know from training and experience that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the

phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, and are central to the negotiation and coordination of drug trafficking, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from the drug dealers' residences.  The telephone itself is evidence of the Target Offenses and likely contains further evidence of the Target Offenses, as discussed below.  In addition, I believe that **Target Premises 1** will likely contain evidence that BUTH used and possessed the telephone, such as telephone bills or other records.

67.     It is also believed that BUTH will be in possession of drug-trafficking equipment, including scales, cutting agents, drug ledgers reflecting to whom he owed money or, in turn, who was indebted to BUTH, as well as other paraphernalia used in the sale, packaging, and procurement of narcotics, in **Target Premises 1** or **Target Premises 2** or both.  Further, given that BUTH distributed wholesale quantities of drugs to others, I believe that BUTH may have stored controlled substances, like cocaine and Percocets, stored at **Target Premises 1** as he prepared them for redistribution.

68.     Furthermore, based on BUTH's recorded statements and firearm sale, I believe that BUTH has possessed and continues to possess firearms and/or ammunition.  BUTH referred to sources of firearms, prior firearm trafficking, and the receipt and possession of multiple firearms. In addition, BUTH referred to possessing a firearm himself.  I know from training and experience

that people tend to possess firearms for a long time, because they are valuable and expensive, difficult to obtain, and durable goods which do not expire.  As a result, I believe that BUTH likely stores firearms at the **Target Premises 1**, which constitute evidence and instrumentalities of the Target Offenses.

69.     In addition, I believe that evidence relating to firearm trafficking (i.e., records regarding the purchase, sale, and/or possession firearms or ammunition) may be inside **Target Premises 1**.  Further, I know that people who deal in and illegally possess firearms and ammunition often take photographs of the firearms and ammunition.  Thus, it is possible that photographic evidence of the firearms and ammunition will be located inside the **Target Premises 1**.

70.     Finally, I believe that BUTH himself may have evidence related to firearm and drug trafficking on his person.  In particular, BUTH said on August 8, 2019, that he carried a firearm when "in town," which I understand to mean that he typically carries a firearm on his person, especially when he leaves his residence. In addition, BUTH may carry one or more cell phones on his person.  Finally, I anticipate that the FBI may encounter BUTH on the street, outside the **Target Premises 1**, which is why I am requesting a search warrant for his person.

71.     Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that BUTH, like many drug and firearm traffickers, uses the **Target Premises** in furtherance of his ongoing drug- and firearm-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the **Target Premises**.  *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir.

1999).[19]   Further, I believe that BUTH may have documentary and other evidence relating to firearm and ammunition purchases, sales, or possession that will be found at the **Target Premises**. Lastly, I know that firearm possession and drug-trafficking are not mutually exclusive activities and that drug traffickers may maintain firearms at their residences for purposes of protection.  *See, e.g., United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989) (noting that firearms have become "tools of the trade" in drug trafficking); *United States v. Alcantara-Saldana*, 2007 WL 9718523, at *10 (D. Mass 2007)

## VII.    SEIZURE OF COMPUTER EQUIPMENT AND DATA

72.    Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities.  A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet.  Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone.  In addition to enabling voice communications, wireless telephones

---

[19]    In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.

      a.      I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription. Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer. Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent

of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

    b.    From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

    c.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

73.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

    b.    Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also

keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media in particular, computers' internal hard drives  contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

31

media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of

computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw

an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.      In addition, based on my knowledge, training, and experience, I know that businesspeople – including drug dealers -- often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

74.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction,

it is often necessary that computer hardware, computer software, and storage media ( computer equipment ) be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.    The volume of evidence - storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.    Technical requirements - analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the

system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

75.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.   Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.   In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.   If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

76.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) the target(s).   If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

77.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.   The review of this electronic data may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### IX.     UNLOCKING A DEVICE USING BIOMETRIC FEATURES

78.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

79.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

80.     The passcode that would unlock the Subject Device found during the search of the Subject Premises is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device found during the search of the Subject Premises to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

81.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

82.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## XI.    CONCLUSION

83.     Based on the information described above, I have probable cause to believe that that BUTH violated 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 922(g)(1)(A).

84.     Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the premises described in Attachment A.

Sworn to under the pains and penalties of perjury,

/s/ Matthew Zaremba
Matthew R. Zaremba
Special Agent
Federal Bureau of Investigation

Signed electronically and sworn to by teleconference on August 10, 2020,



DONALD L. CABELL
United States Magistrate Judge

## ATTACHMENT A-1

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located within 15 Frank Street, Dracut, Massachusetts, a multi-unit apartment/condo building.  The building has a brick exterior with a glass front door and glass rear door.  The number 15 is affixed to the front of the building.  The location to be searched is Apartment number 3.  Apartment 3 has two bedrooms and one bathroom and is located on the second floor with the number 3 affixed to the front door.     A photograph of **Target Premises 1** is below:





40

**ATTACHMENT A-2**

**DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The premises to be searched is a black 2016 Acura RDX, bearing Massachusetts registration 8NB586, vehicle identification number (VIN) 5J8TB4H54GL008661, registered to Sambo Vanny BUTH, 35 Dana Street, Lowell, MA 01850 ("**Target Premises 2**").



41

**ATTACHMENT A-3**

**PERSON TO BE SEARCHED**

The person to be searched is SAMBO BUTH, whose date of birth is April 21, 2019, and whose Social Security Number is 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.  BUTH is make, approximately 5'6" tall, with black hair and brown eyes.  A photograph is BUTH is below.



## ATTACHMENT B

## ITEMS TO BE SEIZED

I.       All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g) and 21 U.S.C. §§ 846 and 841(a)(1), including:

      A.       Records and tangible objects pertaining to the following people, entities, physical addresses, and telephone numbers:

          1.       Sambo BUTH,

          2.       Phearum MEAS,

          3.       Sokmale CHHOY,

          4.       CW-3 (identity known to law enforcement),

          5.       Black 2016 Acura RDX, bearing Massachusetts registration 8NB586,

          6.        Telephone number 978-758-7413,

          7.       Telephone number used 978-866-7487,

          8.       Telephone number 978-697-6997, and

          9.       Telephone number 978-735-3248;

      B.       Records and tangible objects pertaining to drug dealing, including drug presses, scales, packaging materials, cutting agents, or other drug paraphernalia;

      C.       Records and tangible objects pertaining to firearm trafficking, including firearms, ammunition, tools to remove serial numbers, or other firearm paraphernalia;

43

D.      Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by BUTH or any one of the names listed above, including, without limitation:

1.      Drug ledgers or pay-owe sheets, lists of drug customers and drug suppliers, books, papers or notes containing names, addresses, telephone numbers of drug customers and drug suppliers, and receipts relating to narcotics trafficking;

2.      Firearm ledgers or pay-owe sheets, lists of firearm customers and firearm suppliers, books, papers or notes containing names, addresses, telephone numbers of firearm customers and firearm suppliers, and receipts relating to firearm trafficking;

3.      Bank, credit union, investment, money transfer, and other financial accounts;

4.      Credit and debit card accounts;

5.      Tax statements and returns;

6.      Bank statements, money transfer documents or other financial records; and

7.      Cash;

E.      Records and tangible objects pertaining to the travel or whereabouts of BUTH between April 2019 and June 2019;

F.      Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above, including photographs;

G.     Records and tangible objects showing occupancy of the Target Premises, including documents such as bills, correspondence, rent receipts and any other documents evidencing ownership or occupancy of the subject premises;

H.     For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ( the computer equipment ):

    1.    evidence of who used, owned, or controlled the computer equipment;

    2.    evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

    3.    evidence of the attachment of other computer hardware or storage media;

    4.    evidence of counter-forensic programs and associated data that are designed to eliminate data;

    5.    evidence of when the computer equipment was used;

    6.    passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

    7.    records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

I.     Records and tangible objects relating to the ownership, occupancy, or use

of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.     All computer hardware, computer software, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the Target Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at **Target Premises 1 or Target Premises 2** to the sensor of the subject device and/or to hold the device in front of their faces.

### DEFINITIONS

For the purpose of this warrant:

A.     "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.     "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Computer software" means any program, program code, information or

46

data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy s authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files

that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.